# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TYLER J. REED, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) NO. 3:18-cv-01275 |
| | ) JUDGE CAMPBELL |
| KEVIN GENOVESE, Warden, | ) |
| Respondent. | ) |

## MEMORANDUM

Petitioner Tyler J. Reed, a state prisoner, filed a pro se petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1), Respondent filed an Answer (Doc. No. 18), and Petitioner filed a Reply (Doc. No. 27). In the Reply, Petitioner requests an evidentiary hearing. (*Id.* at 8, 10). As explained below, an evidentiary hearing is not warranted, Petitioner is not entitled to relief under Section 2254, and this action will be **DISMISSED**.

### I. PROCEDURAL BACKGROUND

A Sumner County jury convicted Petitioner of first-degree felony murder, aggravated burglary, and employment of a firearm with intent to go armed during the commission of a dangerous felony. (Doc. No. 16-2 at 64–66). The trial court sentenced Petitioner to life imprisonment for the felony murder conviction, plus 6 consecutive years for each of the two other convictions. (*Id.*). The Tennessee Court of Criminal Appeals (TCCA) affirmed the judgments, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *State v. Reed*, No. M2012-02542-CCA-R3-CD, 2013 WL 6123155 (Tenn. Crim. App. Nov. 20, 2013), *perm. app. denied* Apr. 14, 2014.

Petitioner filed a state post-conviction petition. (Doc. No. 16-23 at 3–26). The post-conviction court held an evidentiary hearing (Doc. No. 16-24) and denied relief (Doc. No. 16-23 at 36–49). The TCCA affirmed and the Tennessee Supreme Court denied discretionary review. *Reed v. State*, No. M2017-00480-CCA-R3-PC, 2018 WL 3635076 (Tenn. Crim. App. July 30, 2018), *perm. app. denied* Nov. 14, 2018.

## II. FACTUAL BACKGROUND

The TCCA summarized the evidence presented at trial, and the Court will provide that summary here as context for Petitioner's claims:

> This case involves the October 30, 2009 shooting death of Dickey Lassiter at his home in Sumner County, Tennessee. [The Petitioner] was arrested for the murder of the victim after being found in possession of a twelve-gauge shotgun while in a vehicle parked in the victim's driveway. . . .
>
> . . . .
>
> Mary Lou Lassiter, the victim's sister, testified that the victim was sixty-one years old when he died. He had lived at his farm, Elephant Walk, since 1988. She said that his house was approximately 3,500 square feet in size, and the driveway to the house was three-quarters to one mile long. She further said that a rock wall encircled the house.
>
> Ms. Lassiter testified that James Isenberg had been married to Olivia Lassiter, the sister of Ms. Lassiter and the victim, for a time. However, Mr. Isenberg was also friends with the victim and had lived with the victim for three years prior to the victim's death. Mr. Isenberg had passed away prior to the trial.
>
> On cross-examination, Ms. Lassiter testified that she never heard the victim mention [the Petitioner]'s name. She agreed that the victim had been friends with Mark Griffin and that Mr. Griffin's son, Matthew, had visited Elephant Walk.
>
> James Isenberg, via deposition, testified that he had lived at the victim's house for approximately three years prior to the victim's death. On the night of October 29, 2009, Mr. Isenberg said that he and the victim watched a football game. Mr. Isenberg then he went to the upstairs den where he fell asleep on the couch while watching television. He was awakened by [gunshots]. Mr. Isenberg testified that he heard two shotgun blasts, followed by the victim saying, "'You son of a b****.'" He heard three pistol shots after the victim's exclamation. Mr. Isenberg went halfway down the stairs to investigate. He saw the victim lying on the floor and

2

heard the victim moaning. While he watched, the victim stopped moaning. Mr. Isenberg assumed that he died at that point. Mr. Isenberg called 9-1-1.

Mr. Isenberg testified that the victim had six to seven rifles and shotguns in a gun rack in the downstairs den. The victim also had a pistol that Mr. Isenberg assumed was kept in the victim's bedroom. Mr. Isenberg testified that none of the victim's guns were missing after his death. He further testified that the victim owned several dogs, one of which he occasionally brought inside. Mr. Isenberg did not recall seeing or hearing a dog the night of the victim's death. He said that he had never seen [the Petitioner] prior to seeing him during the deposition.

. . . .

Sergeant Aaron Pickard testified that he was dispatched to the victim's residence at 4:26 a.m. He arrived at 4:35 a.m. and was the first officer at the scene. Sergeant Pickard saw a blue Cadillac in the driveway but did not see anyone inside. He ordered other responding officers to investigate the Cadillac when they arrived. When Sergeant Pickard approached the house, he saw Mr. Isenberg, through a glass storm door, standing on the staircase. Upon entering the house, he smelled gun powder. He found three shotgun shells on the floor, two of which were spent, and he saw a nine millimeter pistol beside the victim's body.

Deputy Christopher Magee testified that when he arrived at the victim's residence, he stopped at the Cadillac and directed all of the lights on his vehicle toward it. He saw movement inside and approached with his weapon drawn. He observed that [the Petitioner] was lying in between the front seat and floorboard, clutching a "dark colored long gun." Deputy Magee directed [the Petitioner] to drop the weapon and exit the vehicle. When [the Petitioner] complied, Deputy Magee handcuffed him and searched him. He asked him whether anyone was with him, and [the Petitioner] responded, "'No.'" He collected [the Petitioner]'s wallet and cellular telephone from [the Petitioner]'s pockets and placed [the Petitioner] in the back of his patrol car. Deputy Magee testified that [the Petitioner] asked him several times whether he could call his parents and told him, "I didn't mean to shoot that guy[,] but I didn't want to get shot."

While [the Petitioner] was sitting in Deputy Magee's vehicle, officers were examining the crime scene and collecting evidence. Captain Don Badacour testified that from the house, he collected three shotgun shells, two of which were spent; three bullet casings, two of which were found in a room behind the victim's body and one of which was underneath his body; and the nine millimeter pistol. He further testified that there were three bullet holes in the house: one went through a front window after ricocheting off a door; one entered the wall by the front windows; and one entered the baseboard under the front windows. Captain Badacour also collected a twelve-gauge shotgun and packaging for a pair of gloves from inside the Cadillac, as well as a gun case from the Cadillac's trunk. On cross-examination, Captain Badacour testified that he dusted for fingerprints in the

3

vehicle and in the house, but he was not aware of the results of the fingerprint analysis.

Lieutenant Christopher Tarlecky testified that he arrived at the crime scene at 5:15 a.m. He interviewed Mr. Isenberg and videotaped the crime scene. He spoke with [the Petitioner], but [the Petitioner] invoked his right to remain silent. Lieutenant Tarlecky performed a gunshot residue test on [the Petitioner]'s hands at the scene. Lieutenant Tarlecky . . . later interview[ed] [the Petitioner] at the Criminal Investigation Division's office, but before that interview, Sergeant Pickard transported [the Petitioner] to the jail and then to the hospital to have his blood drawn for a toxicology analysis. Sergeant Pickard testified that when he and [the Petitioner] were leaving the victim's farm, they saw news vans parked at the end of the driveway. [The Petitioner] asked him "if his name was going to be on the news." Sergeant Pickard responded that "no one knew him by his name or what had went [sic] on at [that] point." Sergeant Pickard testified that [the Petitioner] then said "'I didn't want to kill that guy.'" The recording of their interaction revealed the following exchange:

| [The Petitioner]: | Is that a news van? |
| --- | --- |
| Pickard: | Looks like. |
| [The Petitioner]: | Is it on the news this morning? |
| Pickard: | I don't know. I haven't had time to watch. |
| [The Petitioner]: | If it is, are they going to say my name over the news? |
| Sergeant: | Nobody knows anything at this point. |
| [The Petitioner]: | You know, I didn't mean to kill that guy. |
| Sergeant: | As far as I know. |

When they arrived at the jail, Detective Wes Martin obtained [the Petitioner]'s consent to have his blood drawn, and Sergeant Pickard transported him to the hospital for that to be done.

Just after 11:00 a.m., Lieutenant Tarlecky and Detective Lisa House interviewed [the Petitioner] at the sheriff's office. They advised [the Petitioner] of his *Miranda* rights, and he signed the Admonition and Waiver form. Subsequently, they interviewed [the Petitioner], and the jury was shown a video recording of the interview. During the interview, [the Petitioner] described the events of October 29 and 30. He did not work on October 29, so he spent time with friends, particularly Matthew Griffin. [The Petitioner] told the officers that Matthew Griffin's father had

4

been friends with the victim. At some point prior to October 29, Matthew Griffin told [the Petitioner] about the guns at the victim's house and showed him where the victim lived.

[The Petitioner] said in his statement that he "ate" several Xanax pills throughout the day and smoked marijuana. He went to the mall, to a high school football game, and to a friend's apartment. He and Matthew Griffin went "muddin[g]" in Matthew's truck. At some point, [the Petitioner] concocted a plan to go to the victim's house to take his guns. He said that he would have tried to sell the guns because he needed money to pay for a loan and car insurance. [The Petitioner] said that he tried to get friends to go with him to the victim's house, but the people he asked were either unavailable or were unwilling to go. After parting from Matthew Griffin, [the Petitioner] said that he went home for a short time. He left his house with his loaded shotgun in its case and drove his parents' car to Walmart, where he bought gloves and a ski mask. He said that he wanted to disguise himself in case he saw anyone at the victim's house. [The Petitioner] said that the shotgun was for his own protection. [The Petitioner] drove to the victim's house and walked inside through an unlocked door. He found the gun rack almost immediately but wanted to walk through the house to see if anyone was awake. [The Petitioner] said he walked through the kitchen and "back around." When he did that, he saw the victim. [The Petitioner] said,

> I was trying to make my way to the door[,] and I seen [sic] him holding a pistol. . . . I believe I was standing right beside the door[,] and then he come [sic] around the corner with a pistol. And I think he fired two shots[,] and it [sic] went to my right—to right of me[,] and that's when I shot. And when I shot, I didn't even aim it at him.

[The Petitioner] recalled pumping the shotgun but only remembered firing once. He said that he had three shells in the gun and believed the shells were birdshot. [The Petitioner] said that when he saw the victim fall, he left the house. He did not know "which way [he came] out," and he could not immediately find his vehicle. [The Petitioner] recalled hearing people in the front yard. When he found his car, he "sat there until everybody pulled up."

[The Petitioner] gave his permission for the police to search his cellular telephone, and he also gave permission to search his bedroom at his parents' house. He told Detective House where he kept his remaining ammunition. Lieutenant Tarlecky said that he found a text message conversation on [the Petitioner]'s telephone wherein [the Petitioner] asked Matthew Griffin, "Last drive on right?" The lieutenant said that the message was sent at 3:59 a.m. but not delivered until later that day. Detective House testified that she found the ammunition exactly where [the Petitioner] had told her it would be.

Dr. Feng Li, Senior Associate Medical Examiner, testified that the victim died from two shotgun wounds to the left side of his body, both of which were "potentially

fatal." One wound perforated the victim's left subclavian artery, and the second caused rib fractures and a contusion of the left lung. Dr. Li opined that the muzzle of the shotgun was five to seven feet from the victim.

Several Tennessee Bureau of Investigation ("TBI") agents testified regarding the forensic analysis associated with this case, all of whom were accepted by the trial court as experts in their respective fields. Special Agent John Harrison testified that [the Petitioner]'s blood was negative for alcohol. Special Agent Dawn Swiney testified that [the Petitioner]'s blood was positive for the family of drugs called benzodiazepines and for marijuana metabolite. She further testified that she performed a basic drug screen on [the Petitioner]'s blood, which included screening for Alprazolam, also known as Xanax, and that the screening was negative for Alprazolam. She explained that it would take eighteen to sixty hours for the amount of Alprazolam in the body to become too low to register in the screening.

Special Agent Jennings Russell Davis, II, testified that he analyzed the [gunshot] residue kits taken in this case. The results for the victim's hands were inconclusive, and the results for the [the Petitioner]'s hands were negative for [gunshot] residue. Agent Davis also tested the clothing collected from [the Petitioner]. He found [gunshot] residue on the right sleeve of [the Petitioner]'s hooded jacket and on the ski mask. No [gunshot] residue was found on the remaining articles of clothing.

Special Agent Alex Brodhag testified that he examined both firearms associated with this case. He stated that the nine millimeter pistol found at the scene fired the bullet casings also found at the scene. Agent Brodhag further stated that the shotgun found in [the Petitioner]'s possession fired the two spent shells found at the scene. The shells found at the scene were manufactured by Kent and were twelve gauge, number eight birdshot. Agent Brodhag testified that the ammunition found at [the Petitioner]'s home was consistent with that found at the scene. He further testified that the shotgun pellets removed from the victim's body were number eight birdshot.

Matthew Griffin and Holly Haskins testified on behalf of [the Petitioner]. Matthew Griffin testified that the victim was "like a second father to [him]" and that [the Petitioner] was his best friend. He had a "misunderstanding" with the victim that led him to call the drug task force to make a report against the victim two days before the victim's death. Matthew Griffin testified that he spent the day with [the Petitioner] on October 29. He said that [the Petitioner] might have had some liquor, and he recalled that [the Petitioner] bought Xanax. He did not personally see [the Petitioner] take the Xanax, but he said that [the Petitioner] slept through much of their "four-wheeling" trip. Matthew Griffin attributed [the Petitioner]'s sleepiness to the effects of Xanax. He said that he never took [the Petitioner] to Elephant Walk. On cross-examination, Matthew Griffin said that he had not been mad enough at the victim to kill him.

6

> Holly Haskins testified that she overheard a conversation between [the Petitioner] and Matthew Griffin about the two of them going somewhere. She recalled that [the Petitioner] seemed reluctant to go. She did not remember the destination they discussed, and she did not remember telling law enforcement that they mentioned the name "Lassiter."

*Reed*, 2018 WL 3635076, at *1–4 (quoting *Reed*, 2013 WL 6123155, at *1, 5–10) (footnote omitted).

### III. ASSERTED CLAIMS

Petitioner asserts that trial counsel was ineffective in two ways: (1) coercing Petitioner into making a fabricated proffer statement to prosecutors prior to trial that prevented him from testifying at trial (Doc. No. 1 at 4–5); and (2) failing to adequately investigate Petitioner's mental state and level of intoxication during the offense and when he made statements to law enforcement officers (*id.* at 5–6). Petitioner also asserts that appellate counsel was ineffective for failing to raise five issues in the direct appeal brief. (*Id.* at 6–8). And Petitioner asserts that post-conviction counsel ineffectively litigated Petitioner's claim of appellate ineffectiveness. (*Id.* at 8–9).

### IV. LEGAL STANDARD

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 102. Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State-court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

The demanding review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). To establish prejudice, "a petitioner must show not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801

9

F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## V. ANALYSIS

Respondent contends that Petitioner's two ineffective-assistance-of-trial-counsel claims are properly exhausted, and that the state court's rejection of them was not unreasonable. (Doc. No. 18 at 15–21). Respondent also contends that Petitioner's claim of appellate ineffectiveness is procedurally defaulted without cause, and that his claim of post-conviction ineffectiveness is not cognizable. (*Id.* at 21–23). The Court agrees with Respondent.

### A. Ineffective Assistance of Trial Counsel

The federal law governing the adequacy of a criminal defendant's representation is defined in *Strickland v. Washington,* 466 U.S. 668 (1984). *Premo v. Moore*, 562 U.S. 115, 121 (2011). The TCCA correctly identified this standard before rejecting Petitioner's first two claims on the merits. *Reed*, 2018 WL 3635076, at *10–11.

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Id.* at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

10

Case 3:18-cv-01275   Document 30   Filed 05/03/21   Page 10 of 17 PageID #: 3037

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

1. <u>Coercing a Fabricated Proffer Statement</u>

Petitioner asserts that trial counsel coerced him into giving a fabricated proffer statement to prosecutors before trial. (Doc. No. 1 at 4–5.) As context, Petitioner made several inculpatory statements on the day of the shooting. *See Reed*, 2013 WL 6123155, at *1–5 (summarizing suppression hearing evidence). And by coercing Petitioner to make a false proffer, Petitioner asserts, trial counsel prevented Petitioner from testifying on his own behalf at trial. (Doc. No. 1 at 4–5). That is because Petitioner would have testified "in a manner that was not inconsistent" with his inculpatory statements from the day of the shooting, which would have led to prosecutors impeaching his credibility using the false proffer. (*See id.*).

The TCCA considered and rejected this claim as follows:

The Petitioner stated that lead trial counsel "continually question[ed] [the Petitioner] in a suggestive manner" "[l]ike[ ] he was trying to imply that he wanted [the Petitioner] to tell him something more." When lead trial counsel set up a meeting between the Petitioner and the State, the Petitioner told the State a version

11

> of the offenses that implicated Matthew Griffin. The Petitioner testified that he was precluded from testifying at trial by giving the State a false statement because the State would use the false statement to impeach his credibility if he testified. Lead trial counsel testified that, while he offered various theories to the Petitioner, he did not advise the Petitioner to lie to the State at the proffer meeting. The Petitioner was unable to say what version of the offenses he would testify to if he received a new trial. The post-conviction court found that "[b]ecause this proffered statement differed completely from the statements that he had given law enforcement, [the Petitioner] knew that he would be impeached by the false proffered statement." The post-conviction court also found that the Petitioner "made it perfectly clear at the evidentiary hearing that in looking back he did not know which version he would testify to had he testified during the trial." The post-conviction court implicitly accredited the testimony of lead trial counsel and concluded that the Petitioner had not established that he was prejudiced by lead trial counsel's actions.
>
> We agree with the post-conviction court that the Petitioner has not established that he was prejudiced by lead trial counsel's actions. While the Petitioner may have misunderstood lead trial counsel's intent behind his bouncing around theories of the case, the Petitioner exceeded the scope of lead trial counsel's advice by giving a false statement to the State. The Petitioner was aware that the State could use his proffered statement against him if he testified at trial and his testimony at trial differed from his proffered statement, but he gave a false statement anyway. Because the Petitioner knew at the time he gave the statement that a false statement could foreclose his ability to testify at trial without negative consequences, he cannot establish that he suffered prejudice from lead trial counsel's actions. Further, the Petitioner could not tell the post-conviction court what version of the offenses that he would testify to if he was granted a new trial. The Petitioner cannot establish that the outcome of his trial would have been different if he had not proffered a false statement to the State when he cannot decide what he would have testified to at trial. We conclude that the Petitioner is not entitled to relief on this ground.

*Reed*, 2018 WL 3635076, at *10–11.

It was not unreasonable for the TCCA to conclude that Petitioner failed to demonstrate prejudice as to this claim. A federal habeas court "may not lightly ignore" a state court's "credibility findings; they are entitled to 'great deference' and 'must be sustained unless [they are] clearly erroneous,' particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). Here, the state court credited counsel's testimony that he did not advise the Petitioner to lie to the State at the proffer meeting. Petitioner has not demonstrated that this

12

credibility finding was clearly erroneous. Moreover, Petitioner testified plainly at the evidentiary hearing that he did not know what he would have testified to at trial. (Doc. No. 16-24 at 122 ("I don't know what I would have said, at that point, when the trial was happening.")). But Petitioner did testify to "what the truth is," and he acknowledged that his account of the truth at the evidentiary hearing was consistent with a statement played for the jury at trial that Petitioner made to law enforcement officers on the day of the shooting. (*Id.* at 122–24). Accordingly, it was not unreasonable for the TCCA to conclude that Petitioner failed to carry his burden of establishing "that the outcome of his trial would have been different if he had not proffered a false statement to the State." *See Reed*, 2018 WL 3635076, at *11. This claim is without merit.

2. <u>Failing to Investigate Level of Intoxication</u>

Next, Petitioner asserts that trial counsel failed to investigate adequately his mental state and level of intoxication during the offense and when he made statements to law enforcement officers. (Doc. No. 1 at 5). An adequate investigation and independent blood test, Petitioner asserts, would have enabled him to obtain a voluntary intoxication jury instruction at trial and successfully challenge his *Miranda* waiver. (*Id.*).

The TCCA rejected this claim:

> Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter* [*v. Rose*], 523 S.W.2d [930,] 933 [Tenn. 1975]. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

> Here, the Petitioner did not present evidence of what specifically an additional blood test would have revealed. The State tested the Petitioner's blood and found

13

no evidence of alcohol or Xanax, but the blood was "positive for the family of drugs called benzodiazepines and for marijuana metabolite[.]" Assuming that some of the Petitioner's blood sample remained after the State's testing, the Petitioner could have conducted independent testing of the sample to establish that the testing results would have affected his trial. Thus, the Petitioner cannot establish that he was prejudiced by lead trial counsel's failure to investigate the Petitioner's mental state or level of intoxication during the offenses. He is not entitled to relief on this ground.

This ruling was reasonable. At the evidentiary hearing, Petitioner did not present any evidence to support his assertion of intoxication at the time of the offense and subsequent statements. It was therefore reasonable for the TCCA to conclude that Petitioner failed to demonstrate prejudice for this claim. *See Hutchison v. Bell*, 303 F.3d 720, 748–49 (6th Cir. 2002) (citations omitted) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."); *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("In the absence of any evidence showing that [petitioner's proffered mitigating witnesses] would have offered specific favorable testimony, [petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence."). Accordingly, this claim is without merit as well.

**B. Ineffective Assistance of Appellate Counsel**

Petitioner also asserts that appellate counsel was ineffective for failing to raise five issues in the direct appeal brief. (Doc. No. 1 at 8–9 (listing five specific issues)). Petitioner did not present this claim to the TCCA on post-conviction appeal,[1] and he can no longer do so because it is barred

---

[1] Petitioner did, however, exhaust a claim that appellate counsel was ineffective for failing to raise these five issues in a petition to rehear following the TCCA's direct appeal opinion. *See Reed*, 2018 WL 3635076, at *12–14. But that is not sufficient to exhaust a claim for failing to raise the issues in the initial direct appeal brief. *Wagner*, 581 F.3d at 417 (citations omitted) ("[T]he doctrine of exhaustion requires that the same claim under the same theory be presented to the state courts before raising it in a federal habeas petition.").

14

by Tennessee's "one-petition" limitation on post-conviction relief.[2] *See* Tenn. Code Ann. § 40-30-102(c). Because Petitioner failed to present this claim in state court, and he can no longer do so, it is procedurally defaulted. *See Atkins*, 792 F.3d at 657 (citing *Jones*, 696 F.3d at 483–84).

Citing *Martinez v. Ryan*, 566 U.S. 1 (2012), Petitioner asserts that the procedural default of this claim is attributable to post-conviction counsel's ineffectiveness. (Doc. No. 1 at 10). In some circumstances, a petitioner may rely on post-conviction counsel's ineffectiveness to establish cause "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 566 U.S. at 17. But the Supreme Court has specifically held that *Martinez* does not apply to claims of "ineffective assistance of appellate counsel." *Davila*, 137 S. Ct. at 2065. *Martinez*, instead, is strictly limited to claims of "ineffective assistance of counsel at trial." *Davila*, 137 S. Ct. at 2065–66. Accordingly, Petitioner cannot rely on post-conviction counsel's asserted ineffectiveness to excuse the procedural default of this claim, and it is not subject to further review.

## C. Ineffective Assistance of Post-Conviction Counsel

Finally, Petitioner asserts a standalone claim of ineffective assistance of post-conviction counsel. (Doc. No. 1 at 8–9). This claim will be denied because it is barred by statute and long-standing precedent. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") (citations omitted).

---

[2] There are three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, but none applies to this claim. *See Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)) ("A [Tennessee] prisoner may file a motion to reopen his first post-conviction petition only if his claim stems from a newly established constitutional right that applies retroactively, relies on scientific evidence that he is actually innocent, or involves a sentence enhanced because of a previous conviction that has been declared invalid.").

**D. Request for Evidentiary Hearing**

In the Reply, Petitioner requests an evidentiary hearing relating to his first claim of trial counsel ineffectiveness—coercing him into making a fabricated proffer statement. (Doc. No. 27 at 8, 10). But as explained above, the state courts considered and rejected this claim on the merits. And federal habeas review of a claim adjudicated on the merits in state court "is limited to the record that was before the state court." *Hodges*, 727 F.3d at 541 (quoting *Pinholster*, 563 U.S. at 180–81). Accordingly, Petitioner's request for an evidentiary hearing will be denied.

## VI. CONCLUSION

For these reasons, Petitioner is not entitled to relief under Section 2254 and this action will be dismissed.

Because this constitutes a "final order adverse to" Petitioner, the Court must grant or deny a certificate of appealability ("COA"). Habeas Rule 11(a). A COA may issue only if Petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied these standards and will deny a COA.

An appropriate Order shall enter.

*[signature]*
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE